Quarles & Brady LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, Arizona 85004-2391
TELEPHONE 602.229.5200

Nicole M. Goodwin (024593)
Nicole.goodwin@quarles.com

David H. Bernstein
(dhbernstein@debevoise.com)
Camille Calman (ccalman@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Admitted Pro Hac Vice*

*Attorneys for Defendant Animal Health Division of Bayer HealthCare LLC*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Farnam Companies, Inc. d/b/a/ Central Life Sciences,<br><br>Plaintiff.<br><br>vs.<br><br>Animal Health Division of Bayer HealthCare LLC,<br><br>Defendant. | NO. CV-02853-HRH<br><br>**DECLARATION OF CYNTHIA HUGHES-COONS IN SUPPORT OF ANIMAL HEALTH DIVISION OF BAYER HEALTHCARE LLC'S MOTION TO DISMISS OR, ALTERNATIVELY, TO STAY** |

I, Cynthia Hughes-Coons, hereby declare as follows:

1. I am Assistant General Counsel at defendant Animal Health Division of Bayer HealthCare LLC ("Bayer"). Among the products for which I provide legal support at Bayer are K9 Advantix, which controls fleas, ticks, mosquitoes, lice and biting flies on

dogs, and Advantage, which controls fleas on cats and dogs, as well as lice on dogs. I submit this declaration on personal knowledge and a review of Bayer's business records in support of Defendant Bayer's Motion to Dismiss or, Alternatively, to Stay.

2. For many years, Bayer distributed its Advantage and K9 Advantix pest control products only through veterinarians (though, inevitably, some portion of the products was diverted to retail channels without Bayer's consent). In March 2010, Bayer began to sell its products over the counter through pet specialty stores and pet-care websites, as well as through veterinarians. This strategic change has been a success and now allows Bayer's products to also reach those consumers who may prefer to buy these products without a doctor visit. Bayer's K9 Advantix and Advantage line of products are the second most popular flea control products in the United States (behind Merial Limited's Frontline brand).

3. During the past three years, Bayer and its competitors in the flea and tick control market have participated in several proceedings related to advertising claims and substantiation before the National Advertising Division of the Council of Better Business Bureaus (the "NAD"). The NAD is the advertising industry's forum for self-regulation of advertising. As the NAD notes on its website, its "mission is to review national advertising for truthfulness and accuracy and foster public confidence in the credibility of advertising." *See* attached Exhibit A (a true and correct copy of a printout from the website www.nadreview.org). Through these proceedings, the industry has educated the NAD about the products regularly sold in this category, as well as the testing that commonly is used to substantiate advertising claims for flea and tick control products.

4. Under the NAD procedures, each party can submit one or two written letters setting out its positions, and can then meet with the NAD to discuss the advertising and the substantiation for that advertising. NAD Procedures, ¶¶ 2.2A, 2.5-2.7 (a true and

correct copy of the NAD Procedures is attached hereto as Exhibit B). NAD's procedures provide for the issuance of its decisions within 60 business days of the initial challenge letter. *Id.* at ¶ 2.9; *see also* "How the NAD Works," from the NAD website at http://www.nadreview.org/HowNADWorks.asp, a true and correct copy of which is attached hereto as Exhibit C ("NAD adheres to a strict timetable; providing a written decision within 60 business days.").

5. Because the NAD is a self-regulatory forum and lacks the legal power to enforce its decisions, compliance with NAD decisions is voluntary. Nevertheless, as a testament to the quality of its decisions and the respect with which the NAD is held throughout the industry, the NAD reports that advertisers comply with its decisions more than 95 percent of the time. *See* Better Business Bureau website at http://www.bbb.org/us/cbbb-staff/andrea-levine/, a true and correct copy of which is attached hereto as Exhibit D ("NAD has generated a 96% compliance rate without legal sanction or regulatory authority").

6. One reason for the NAD's high compliance rate is its policy of reporting non-complying advertisers to the FTC. *See* Ex. B, at ¶ 2.1F (if the advertiser "elects not to participate in the self-regulatory process, NAD/CARU shall prepare a review of the facts with relevant exhibits and forward them to the appropriate federal or state law enforcement agency"). Indeed, the FTC, which is the United States' national regulator of advertising, has repeatedly praised NAD. For example, a 1999 FTC report on self-regulation in the alcohol industry described NAD as an "especially effective model of self regulation . . . [that] has handled over 3,500 cases since 1971," and said that "in virtually all cases advertising found to be misleading has been discontinued or modified voluntarily." *See* Exhibit E (a true and correct copy of a printout of this report from the website http://www.ftc.gov/reports/alcohol/alcoholreport.htm). Former FTC Chairman

Robert Pitofsky called NAD "the best example of self-regulation that I am aware of in American industry." *See* Exhibit F (a true and accurate copy of remarks by Deborah Platt Majoras, Chairman, Fed. Trade Comm'n, Self Regulatory Organizations and the FTC, at 10 (Apr. 11, 2005)). And former FTC Commissioner Sheila Anthony has called the NAD "a model of effective, private, self-regulatory programs." *See* Exhibit G (a true and correct copy of Commissioner Anthony's statement as reproduced on the FTC website at http://www.ftc.gov/bcp/workshops/weightloss/transcripts/transcript-113-117.pdf.

7. Drawing on its expertise in advertising matters, the NAD has issued a number of decisions recommending that advertisers in the field of flea and tick control products (including Bayer, Merial Ltd., Elanco Animal Health and Summit VetPharm) modify their advertisements to ensure that their claims are properly substantiated; in every completed case, advertisers have voluntarily agreed to modify their advertisements to comply with NAD's recommendations.

8. For example, in 2008, Bayer filed an NAD challenge in which it alleged that Summit VetPharm LLC, the maker of competing products Vectra 3D and Vectra, was disseminating false and misleading advertising claims regarding Summit's and Bayer's products. The NAD concluded that Summit's testing did not adequately substantiate Summit's comparative and monadic claims, and that the evidence did not support Summit's claims that veterinarians and pet owners preferred Vectra's applicator and results over those of Bayer's competing products. Attached as Exhibit H is a true and correct copy of the NAD's decision on that challenge.

9. In 2009, Bayer brought an NAD challenge against new Summit advertising that made comparative and monadic claims against Bayer's products that, Bayer believed, lacked substantiation. The NAD found that the comparative claims were unsupported but that the monadic claims could be made to veterinary professionals provided that they

were statistically significant. Attached as Exhibit I is a true and correct copy of the NAD's decision on that challenge. The parties thereafter appealed NAD's decision to the National Advertising Review Board ("NARB"), which is the entity that hears appeals from NAD decisions. The NARB upheld the NAD's decision requiring that Summit discontinue its comparative claims but reversed the NAD's decision permitting Summit to continue to make its monadic claims. Instead, the NARB held that Summit's monadic claims also were unsupported by appropriate substantiation, and recommended that those advertising claims be discontinued as well. Attached as Exhibit J is a true and correct copy of the NARB's decision on that appeal.

10. In 2009, Bayer brought an NAD challenge against Elanco Animal Health ("Elanco"). Bayer alleged that Elanco's claims for its orally ingested flea control product, Comfortis, made false and misleading claims about Elanco's and Bayer's products. The NAD recommended that Elanco discontinue implied claims that its product kills fleas faster than other products, as well as claims of specific flea kill percentages and overstated claims of the dangers of topical pesticides. Attached as Exhibit K is a true and correct copy of the NAD's decision on that challenge; attached as Exhibit L is a true and correct copy of the NAD's subsequent decision related to Elanco's compliance with NAD's initial decision.

11. In 2010, Elanco submitted an NAD challenge alleging that Bayer's advertising claims for Advantage and K9 Advantix were not substantiated by reliable evidence and were implicitly false and misleading . The NAD found that the allegedly false implicit claims were truthful, or were non-actionable puffery, but recommended that one of Bayer's claims be made only to veterinarians and only when accompanied by the supporting evidence. Attached as Exhibit M is a true and correct copy of the NAD's decision on that challenge

12. In 2010, Bayer challenged Merial's advertising for its Frontline Plus product at the NAD. The NAD found that Merial's description of its product as a "complete killing force" was misleading to consumers and should be discontinued, and that its claims that Frontline Plus was "unlike other products" should be clarified. Attached as Exhibit N is a true and correct copy of the NAD's decision on that challenge. Merial has agreed to modify most of the false claims, though one narrow issue is currently on appeal to the NARB.

13. In 2010, Elanco also brought an NAD challenge to Merial's Frontline advertising. The NAD recommended that Merial discontinue claims that Elanco's products do not provide "complete flea control;" that Merial's comparative speed-of-kill claims were not supported; and that consumers were confused about differences between the two products. Attached as Exhibit O is a true and correct copy of the NAD's decision on that challenge. This decision also is currently on appeal to the NARB.

14. Bayer brought a challenge at the NAD against Plaintiff Farnam Pet Products ("Farnam") for its advertising of its Bio Spot products in November 2010. Bayer filed its action at the NAD because it had no intention of suing Farnam in court. Rather, as Bayer made clear with the filing of the NAD challenge, Bayer's only intention was to seek a resolution of this advertising dispute at the NAD (as Bayer and its competitors have done with other advertising-related challenges in recent years). I can affirm that Bayer continues to have no intention of suing Farnam over the Bio Spot advertising at issue in this case. However NAD rules, Bayer will accept NAD's decision in this case.

15. Under NAD rules, NAD will administratively close a case if the same claims are the subject of a federal court procedure. On December 7, 2010, once it learned that Farnam had filed a complaint in this Court, NAD issued an order administratively closing its case involving Farnam's advertising. In that order, though, NAD "noted for the record its willingness to reopen the case should the court remand the matter to NAD or, for other reasons, not reach a conclusion on the truthfulness and accuracy of the challenged claims." A true and correct copy of the NAD's order closing the case is attached as Exhibit P.

16. One significant benefit that has resulted from these many recent NAD decisions on flea and tick control products is that they have provided substantial guidance to the industry, and to veterinarians and consumers, about these products, their relative efficacy, and the kinds of advertising claims that will be permitted. If NAD is permitted to complete its work in the Farnam matter, it will provide Bayer, Farnam and the industry with further guidance on the kind of substantiation needed for certain claims and whether claims like Farnam's are non-actionable puffery or whether they violate the FTC Guides Concerning the Use of Endorsements and Testimonials in Advertising. See Exhibit Q, which is a true and correct copy of an October 5, 2009 FTC press release titled "FTC Publishes Final Guides Governing Endorsements, Testimonials."

I declare under penalty of perjury that the foregoing is true and correct. Executed at Shawnee, Kansas, this 28th day of January, 2011.

Cynthia Hughes-Coons